**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**SECURITIES AND EXCHANGE COMMISSION,**

                                        **Plaintiff,**

**v.**

**LG CAPITAL FUNDING, LLC, and**
**JOSEPH I. LERMAN,**

                                   **Defendants,**

**and**

**DANIEL GELLMAN,**
**BORUCH GREENBERG, and**
**ELI SAFDIEH,**

                                   **Relief Defendants.**

**COMPLAINT**

**Civil Action No. 22-cv-3353**

Plaintiff Securities and Exchange Commission ("SEC") alleges as follows:

<u>**SUMMARY**</u>

1.      From at least January 1, 2016 through at least December 31, 2021 (the "Relevant Period"), LG Capital Funding, LLC ("LG Capital") and its managing member and 50% owner Joseph I. Lerman ("Lerman"), acted as securities dealers, engaged in the business of buying and selling large volumes of penny stocks for their own account, without being registered as a dealer with the SEC and without Lerman associating with an SEC-registered dealer.

2.      LG Capital's business model – which was carried out under Lerman's direction and control – involved purchasing convertible promissory notes from penny stock issuers for the exclusive benefit of Lerman and its two other principals, later converting those notes into unrestricted, newly issued shares of penny stocks at a substantial discount to the then-prevailing

market price (typically 35% to 50%), and a quick re-sale of the post-conversion shares into the public markets to capture the benefit of the discount.

3.      During the Relevant Period, LG Capital purchased or funded approximately 330 convertible notes of more than 100 different penny stock issuers, the majority repeat customers. It converted at least 150 of the 330 convertible notes into more than 23 billion unrestricted, newly issued shares of common stock – shares that had never traded publicly until LG Capital introduced them into the public markets.

4.      LG Capital's convertible notes business was lucrative. It generated at least $30 million in gross stock sale proceeds and at least $20 million in profits from its post-conversion sale of shares. Upon information and belief, LG Capital continues to hold unconverted notes and shares derived from converted notes, and is still engaged in the convertible note business today.

5.      In practice, LG Capital began to sell post-conversion shares soon after each conversion and derived profits principally from the discounted acquisition price, as opposed to appreciation in the market price of the issuer's common stock.

6.      Lerman at all times controlled and had final authority over LG Capital's business decisions. His actions committed LG Capital to the initial investments and to the later acquisition and sale of discounted shares. He signed all of the agreements pursuant to which LG Capital acquired the convertible notes. He signed a majority of the notices that LG Capital used to convert the notes into newly issued, free-trading shares. He controlled LG Capital's bank accounts and authorized a majority of the funding wires. He controlled LG Capital's brokerage accounts and, in connection with a majority of conversions, executed the paperwork needed to deposit the converted shares into LG Capital's brokerage accounts. He instructed LG Capital's contract accountant on how to record the transactions in LG Capital's books and records.

7.      By failing to register as securities dealers, and by Lerman's failure to associate with a registered securities dealer, LG Capital and Lerman avoided the regulatory obligations that govern dealer conduct. Those obligations include submitting to regulatory inspections and oversight, following financial responsibility rules, and maintaining books and records in accordance with applicable regulatory requirements.

8.      Relief Defendants Daniel Gellman ("Gellman"), Boruch S. Greenberg ("Greenberg"), and Eli Safdieh ("Safdieh") each received a portion of the proceeds of Defendants' violations, to which they have no legitimate claim.

## VIOLATIONS

9.      By virtue of the conduct alleged in this Complaint, LG Capital and Lerman have violated Exchange Act Section 15(a) [15 U.S.C. § 78o(a)]. In the alternative, Lerman is liable under Exchange Act Section 20(a) as a control person for LG Capital's violations of Exchange Act Section 15(a) [15 U.S.C. § 78t(a)].

10.      Unless LG Capital and Lerman are restrained and enjoined, they will continue to engage in the acts, practices, transactions, and courses of business set forth in this Complaint, or in acts, practices, transactions, and courses of business of similar type and object. The SEC seeks injunctive relief, disgorgement, civil penalties, and other appropriate and necessary equitable relief, including penny stock bars, and, as to the Relief Defendants, an order instructing them to return the distributed proceeds of Defendants' violations.

## JURISDICTION AND VENUE

11.      This Court has jurisdiction over this action, and venue lies in this District, pursuant to Exchange Act Sections 21(d) and 27 [15 U.S.C. §§ 78u(d) and 78aa]. Defendants, directly or indirectly, have made use of the means or instrumentalities of interstate commerce or

of the mails in connection with the transactions, acts, practices, and courses of business alleged in this Complaint. These transactions, acts, practices, and courses of business occurred largely within the Eastern District of New York, where LG Capital is located and does business, where Lerman works and resides, and where Gellman, Greenberg, and Safdieh worked at all relevant times.

## DEFENDANTS

12.    **LG Capital Funding, LLC** is a New York limited liability company created in 2013, with its principal place of business in Brooklyn, New York. LG Capital is mainly engaged in the convertible notes business. Lerman, Gellman, and Greenberg are its founding members. Lerman owns 50% of the business; Gellman and Greenberg each own 25% of the business. LG Capital exclusively invests the capital of its three principals. It has never registered with the SEC as a securities dealer or in any other capacity. On the second floor of a two-story building in Brooklyn, New York, LG Capital shares office space with two other businesses owned by Lerman, Gellman, and Greenberg, one of which funds private companies through merchant cash advances.

13.    **Joseph I. Lerman**, age 50, is a managing member and 50% owner of LG Capital. He resides and works in Brooklyn, New York. Lerman has never registered with the SEC in any capacity and has never been associated with an SEC-registered dealer. Lerman is a licensed and registered attorney in the State of New York.

## RELIEF DEFENDANTS

14.    **Daniel Gellman**, age 38, is a managing member and 25% owner of LG Capital. During the Relevant Period, Gellman resided in Rockland County, New York, and periodically worked in Brooklyn, New York; upon information and belief, since 2021, he has resided in

Parkland, Florida. During the Relevant Period, Gellman received periodic distributions of more than $1.8 million from LG Capital, to which he is not entitled. Gellman has never registered with the SEC in any capacity and has never been associated with an SEC-registered dealer.

15.    **Boruch S. Greenberg**, age 42, is a managing member and 25% owner of LG Capital. Greenberg resides in Brooklyn, New York, where he also worked during the Relevant Period; in 2021, he resided in Surfside, Florida. During the Relevant Period, Greenberg received periodic distributions of more than $1.8 million from LG Capital, to which he is not entitled. Greenberg has never registered with the SEC in any capacity and has never been associated with an SEC-registered dealer.

16.    **Eli Safdieh**, age 38, was employed by LG Capital from at least January 1, 2016 through at least December 31, 2020, and worked in Brooklyn, New York during that time. Upon information and belief he currently resides in Deal, New Jersey. Safdieh assisted LG Capital in locating convertible note opportunities. Safdieh had no authority to bind LG Capital and instead presented opportunities to Lerman for approval. During the Relevant Period, in addition to receiving a salary, Safdieh received discretionary bonuses of more than $1.1 million, to which he is not entitled. Safdieh has never registered with the SEC in any capacity and has never been associated with an SEC-registered dealer.

## FACTS

17.    During the Relevant Period, LG Capital and Lerman operated a business, in Brooklyn, New York, through which LG Capital purchased convertible notes (a type of security) from penny stock issuers in need of cash, with an eye toward converting the notes into unrestricted newly issued shares, and then distributing the shares into the public markets. Each note was accompanied by the following restrictive legend, or something similar:

> THIS NOTE AND THE COMMON STOCK ISSUABLE UPON
> CONVERSION OF THIS NOTE HAVE NOT BEEN AND WILL
> NOT BE REGISTERED WITH THE UNITED STATES
> SECURITIES AND EXCHANGE COMMISSION OR
> PURSUANT TO AN EXEMPTION FROM REGISTRATION
> PROVIDED UNDER THE SECURITIES ACT OF 1933, AS
> AMENDED, AND THE RULES AND REGULATIONS
> PROMULGATED THEREUNDER (THE "1933 ACT").

To resell the shares into the public markets without restriction, LG Capital typically held a note for six months, or until such time as it could claim the SEC Rule 144 exemption from registration. LG Capital then began to convert each note into unrestricted, newly issued shares of the issuer's common stock. It typically converted only a portion of each note's principal and accrued interest at a time. In connection with each incremental conversion, it acquired shares at the pre-negotiated discount (generally 35% to 50%) to the then-prevailing market price. Soon after receipt of the post-conversion shares – and before the benefit of its negotiated discount dissipated – it began to sell the shares into the public markets. Once LG Capital had sold off its inventory of the issuer's post-conversion shares, it would repeat the process until the note was fully converted. Since the conversion price was recalculated for each incremental conversion, LG Capital received the discount on the then-current market price, regardless of whether the market price had increased or decreased since the last conversion.

18.    Nearly all of the shares that LG Capital sold in its business were acquired directly from issuers through note conversions and not from purchases made in the secondary market. LG Capital's public sale of unrestricted, newly issued shares significantly increased the amount of shares trading publicly and the issuers' unrestricted share totals.

### LG Capital Cultivated and Regularly Secured Repeat Business from Issuers

19.    During the Relevant Period, LG Capital purchased and funded approximately 330 convertible notes of more than 100 penny stock issuers. It typically purchased the notes directly

from the issuers. Occasionally, with an issuer's permission, it purchased aged notes from other convertible note financiers; the issuers then issued LG Capital replacement notes that extended the maturity date.

20.     LG Capital sourced convertible note opportunities through multiple channels.

21.     Initially, Lerman hired an employee who solicited, on LG Capital's behalf, issuers that expressed a need for financing. As LG Capital developed a reputation in the convertible note space, issuers reached out to LG Capital's employee directly, or through brokers and finders, to solicit LG Capital's interest in making convertible note investments.

22.     By early 2016, LG Capital had developed a regular clientele with which it did repeat convertible note business. More than half of the approximately 100 issuers with which LG Capital did business during the Relevant Period sold multiple convertible notes to LG Capital over time. LG Capital often contractually locked in this repeat business through stock purchase agreements that were executed by Lerman. Many of the stock purchase agreements provided for LG Capital to purchase and fund multiple notes from the issuer on a set schedule. For example, LG Capital entered into three stock purchase agreements with one issuer, through which LG Capital was obligated to and did purchase at least 13 separate notes over an approximate two year period, by funding new notes every couple of months.

23.     An LG Capital employee acting under Lerman's supervision negotiated the terms of each convertible note and presented them to Lerman for approval. The employee had no authority to bind LG Capital to any convertible note transaction.

24.     At all relevant times, Lerman possessed and exercised final decision-making authority over LG Capital's convertible notes business and whether to invest LG Capital's funds in a particular issuer. He signed every securities purchase agreement and every debt purchase

agreement by which LG Capital acquired the approximately 330 notes, and any amendments to those agreements. He was typically the person who authorized LG Capital's bank wires to the issuer or seller to fund and consummate each note transaction.

**LG Capital Always Contracted for and Exercised the
Right to Convert Notes to Shares at a Significant Discount to Market Price**

25.     The notes that LG Capital purchased and funded during the Relevant Period contained terms that gave LG Capital the right to convert the principal and accrued interest, in full or part, into shares of the issuer's common stock at a substantial discount to the prevailing market price. The conversion discounts typically ranged from 35% to 50% off the market price, which the notes typically defined as the lowest trading price, or lowest closing bid price, of the issuer's common stock during the 10 to 20 days on or before the date of the conversion notice. Additional discounts could apply under certain identified circumstances, such as if the issuer's stock fell below a certain price. Also, for notes with an original issue discount ("OID"), LG Capital was entitled to convert the full principal amount, plus interest accrued on that amount, at the applicable conversion discount, even though it had funded less than the principal amount.

26.     The notes discouraged issuers from repaying the note in cash before maturity. The notes typically specified that there was no prepayment right after 180 days and imposed monetary penalties (ranging from 15% to 45% of the note's principal amount) if the issuer repaid the note before 180 days.

27.     LG Capital converted at least 150 of the approximately 330 convertible notes that it purchased and funded during the Relevant Period.

28.     From mid-March 2017 through mid-March 2020, Lerman signed the conversion notices for every conversion made by LG Capital during that period. Before March 2017, and

after March 2020, two LG Capital employees executed the conversion notices while acting under authority granted to them by Lerman and another managing member of LG Capital.

29.    LG Capital timed its conversions in an attempt to satisfy the holding periods specified in SEC Rule 144 to remove the resale restriction on the securities. Rule 144 allows non-affiliates who have acquired restricted stock directly from an issuer in a private transaction to resell the stock into the public markets without restriction after observing a holding period, among other requirements. 17.C.F.R. § 210.144. Each of LG Capital's conversion notices was accompanied by an opinion letter in which LG Capital's attorney opined that the Rule 144 exemption from registration had been met and that the requested shares should be issued to LG Capital without a restrictive legend so they could be resold into the public markets without registration.

30.    LG Capital's practice was to convert each note in multiple increments. It converted a portion of a note's principal and accrued interest, sold the resulting post-conversion shares into the public markets, and then converted another portion of the principal and interest, repeating the process until the note was fully converted and all shares were sold. LG Capital sometimes made up to a dozen incremental conversions of some notes, taking months to fully convert a note and sell the underlying shares.

31.    LG Capital's practice of incrementally converting a note, and then selling the shares before making the next conversion, was a way for LG Capital to insulate itself from market price movements and to capture as much of the discount feature as possible. Each conversion was based on a discount to the then-prevailing market price, and if the market price had moved downward since the last conversion, the following conversion was based on a discount to the diminished price.

32.     From at least mid-March 2017 through at least mid-March 2020, in connection with incremental conversions during that period, Lerman executed documents that LG Capital's brokerage firms and clearing broker required to deposit converted shares into LG Capital's brokerage accounts. LG Capital employees acting under authority granted to them by Lerman and another managing member of LG Capital executed deposit-related brokerage documents prior to March 2017 and after March 2020.

### LG Capital's Note Conversions Yielded Net Profits of Approximately $20 Million During the Relevant Period

33.     From 2016 through December 31, 2021, LG Capital converted at least 150 notes (or 45%) of approximately 330 convertible notes it funded, and sold more than 23 billion unrestricted, newly issued shares of common stock into the public markets, generating approximately $30 million gross stock sale proceeds. The notes cost approximately $10.5 million to acquire. LG Capital's net profit on the converted notes was approximately $20 million. The vast majority of these profits resulted from the difference between the discounted prices at which LG Capital acquired shares from issuers and the price at which it resold those shares into the market, as opposed to increases in the share price over time.

34.     During the same period, approximately 68 of the 330 notes (or 23%) were "redeemed" by the issuer at a premium or paid at maturity – often with cash flow provided by the issuer's entry into new convertible notes with other financiers. LG Capital acquired these notes for a cost of approximately $5.7 million and received back the principal, interest, and penalties on these notes. LG Capital generally preferred to convert a note than to be paid in cash and, in at least one instance, when an issuer expressed interest in redeeming multiple notes, LG Capital enforced its contractual rights and did not allow the issuer to redeem notes that were more than 180 days past the issue date.

35.     Some of the notes that LG Capital purchased and funded during the Relevant Period were never converted. These notes, which LG Capital acquired for approximately $6.5 million, were not converted for various reasons, including because the issuer's shares ceased to be eligible for the Rule 144 exemption from registration, the issuer filed for bankruptcy, the issuer did not have a sufficient number of authorized shares in reserve, or the issuer's shares were deregistered by the SEC. LG Capital filed breach of contract lawsuits against many such issuers, including in the United States District Court for the Eastern District of New York; in some of those suits, LG Capital sought to compel the issuer to honor LG Capital's conversion notices. Upon information and belief, LG Capital continues to hold some unconverted notes.

36.     The following are examples of LG Capital's relationship with three penny stock issuers during the Relevant Period, which highlight how LG Capital purchased and funded convertible notes, exercised its conversion rights, and sold the resulting unrestricted, newly issued shares into the public markets for significant profits:

**Medifirst Solutions, Inc.**

37.     From January 1, 2016 through February 20, 2020, Lerman executed debt purchase agreements ("DPA") and stock purchase agreements ("SPA") pursuant to which LG Capital acquired a total of 14 convertible note obligations of Medifirst Solutions, Inc. ("Medifirst") (Ticker: MFST), a Nevada corporation located in Freehold, New Jersey.

38.     Medifirst was a regular client of LG Capital. LG Capital first purchased two aged convertible notes (MFST-1AD and MFST-2AD) from another penny stock financier; and, Medifirst issued LG Capital replacement notes that extended the maturity date, for no additional consideration. LG Capital purchased another 12 notes directly from Medifirst.

39.     LG Capital, acting through Lerman, purchased Medifirst's notes with an eye toward converting them and distributing newly issued shares of Medifirst's common stock into the public markets.

40.     The following chart lists the Medifirst convertible notes that LG Capital purchased and funded on or after January 1, 2016:

| LG Capital Note ID | Principal Amount | OID or Other Discount at Time of Acquisition | SPA (DPA) Date | Issue Date | Funded Date |
|---|---|---|---|---|---|
| MFST-1AD | $ 61,509 | $ 13,491 | Jan. 7, 2016 (DPA) | Jan. 7, 2016 | Jan. 8, 2016 |
| MFST-2AD | $ 39,557 | $ 3,443 | Jan. 7, 2016 (DPA) | Feb. 29, 2016 | Feb. 29, 2016 |
| MFST-2NN | $ 105,000 | $ 20,000 | Jan. 7, 2016 | Jan. 7, 2016 | Jan. 13, 2016 |
| MFST-2BE | $ 50,000 | | " | Jan. 7, 2016 | May 3, 2016 |
| MFST-3NN | $ 50,000 | | " | Mar. 7, 2016 | Mar. 16, 2016 |
| MFST-3BE | $ 46,803 | | " | Mar. 7, 2016 | June 28, 2016 |
| MFST-4NN | $131,250 | | May 1, 2017 | May 1, 2017 | May 2, 2017 |
| MFST-5NN | $125,250 | | " | June 2, 2017 | June 16, 2017 |
| MFST-6NN | $125,250 | | " | July 10, 2017 | July 25, 2017 |
| MFST-7NN | $125,250 | | " | Aug. 7, 2017 | Aug. 24, 2017 |
| MFST-8NN | $ 78,750 | | Jan. 25, 2018 | Jan. 25, 2018 | Feb. 13, 2018 |
| MFST-9NN | $ 52,500 | | June 4, 2018 | June 4, 2018 | June 18, 2018 |
| MFST-10NN | $ 27,000 | | Nov. 13, 2019 | Nov. 13, 2019 | Nov. 19, 2019 |
| MFST-11NN | $ 30,000 | | Feb. 20, 2020 | Feb. 20, 2020 | Feb. 24, 2020 |

LG Capital often acquired multiple notes from Medifirst under one stock purchase agreement, providing the issuer with funding and LG Capital with a stream of notes that could be converted into shares over time, without the need to negotiate new acquisition terms.

41.     Each front-end note (identified by LG Capital as "NN" in the note's title) and each replacement for the aged notes (identified by LG Capital as "AD" in the note's title), had an 8% rate of interest and a 1-year maturity. After six months from the issuance date, LG Capital

was entitled to convert each note, in full or part, at a 42% or 45% discount to the market price depending on the note. Notes purchased pursuant to the January 7, 2016 agreements had a **45% discount** rate. Later notes had a **42% discount** rate. Each note set forth a conversion equation that established LG Capital's share acquisition price at 55% or 58% of the **lowest trading price** of Medifirst common stock for the **14** or **20** trading days prior to and including the date on which a conversion notice was received. LG Capital was entitled to an additional 10% discount if certain additional conditions existed at the time of conversion. Medifirst had a right to redeem the notes, at a premium ranging from 105% to 125% of the unpaid principal, plus accrued interest. With MFST-11NN, Medifirst had no redemption right after the 180th day.

42.     Each back-end note (identified by LG Capital as "BE" in the note's title) had conversion terms similar to its corresponding front-end note; except, instead of funding back-end notes in cash, LG Capital initially issued to Medifirst an offsetting collateralized secured promissory note (signed by Lerman) as a placeholder. LG Capital's conversion right under the back-end notes was triggered by its payment of cash to the issuer, which cancelled the collateralized note. Once the cash payment was received by Medifirst, LG Capital had the right to immediately convert the back-end note in full or part. Medifirst could redeem each back-end note for an amount equal to 135% of the unpaid principal plus accrued interest for the first 180 days; no right of redemption existed after 180 days. If Medifirst redeemed the corresponding front-end note, the backend note would automatically be deemed cancelled.

43.     Lerman authorized LG Capital to fund each of the foregoing notes. He instructed LG Capital's bank to wire the funds to Medifirst, less any OID, and attorneys' fees which were paid by Medifirst from the notes' proceeds.

44.     LG Capital converted nine of the 14 Medifirst notes. It converted those notes in 97 increments. Lerman was the sole person to execute the conversion notices from April 7, 2017 through March 5, 2020. In all, Lerman executed 53 notices to convert Medifirst notes to shares of common stock. Two employees acting under Lerman's delegated authority executed the other 44 conversion notices. Through these conversions, LG Capital acquired more than 2.2 billion shares of Medifirst common stock at a substantial discount to the then-prevailing market price.

45.     In connection with the conversions for which Lerman signed conversion notices, Lerman also facilitated the deposit of post-conversion shares into LG Capital's brokerage accounts by executing documents, including security deposit agreements, securities deposit request forms, fee acknowledgements, and risk questionnaires. LG Capital employees acting under the authority of Lerman and another LG Capital member executed such documents at other times. Lerman was a primary contact person on LG Capital's brokerage accounts.

46.     During the Relevant Period, LG Capital sold the more than 2.2 billion shares of Medifirst common stock into the public markets, over the course of 621 trade dates. On 262 of the 621 trade dates (more than 40%), LG Capital's trades represented 20% or more of the daily trading volume. LG Capital received sales proceeds of more than $2 million from these sales.

47.     LG Capital did not convert the Medifirst notes to hold the shares for appreciation. It converted the notes instead to promptly sell the shares into the public markets and capture as much of the spread between its discounted acquisition price and the market price as possible. LG Capital typically took four to 15 days from the date of the conversion notice to complete the sale of all Medifirst shares received in a conversion.

48.     In September 2021, the SEC entered an order suspending trading in Medifirst's securities. This triggered the default provisions on all remaining unconverted notes. As a result,

notes MFST-7NN through MFST-11NN were never converted. On May 2, 2022, the SEC revoked Medifirst's Exchange Act registration. Medifirst had not filed a periodic report with the SEC since it filed a Form 10-Q for the quarter ended September 30, 2019, a period in which Medifirst reported a net loss of $526,562.

### FreeSeas, Inc.

49.     From April 19, 2016 through August 17, 2017, Lerman executed debt purchase agreements and stock purchase agreements pursuant to which LG Capital acquired eight convertible note obligations of FreeSeas, Inc. ("FreeSeas") (Ticker: FREEF), a now-annulled Republic of Marshall Islands corporation with principal offices in Athens, Greece..

50.     FreeSeas was a regular client of LG Capital. LG Capital purchased three aged notes from law firms in New York and Greece that had accepted FreeSeas convertible notes as payment for services or in settlement of debts. FreeSeas issued replacement notes to LG Capital that extended the maturity on two of the notes, for no additional consideration. LG Capital purchased five additional convertible notes directly from FreeSeas.

51.     LG Capital, acting through Lerman, purchased FreeSea's convertible notes with an eye toward converting them and distributing newly issued shares of FreeSea's common stock into the public markets.

52.     The following chart lists the FreeSeas convertible notes that LG Capital purchased and funded on or after January 1, 2016:

| LG Capital Note ID | Principal Amount | OID or Other Discount at Time of Acquisition | SPA (DPA) Date | Issue Date | Funded Date |
|---|---|---|---|---|---|
| FREE-1AD | $ 92,216 | $ 3,934.34 | Apr. 19, 2016 (DPA) | Apr. 19, 2016 | Apr. 21, 2016 |
| FREE-2AD | $ 55,998.24 | | Jan. 20, 2017 (DPA) | Jan. 20, 2017 | Feb. 8, 2017 |
| FREE-3AD | $ 55,998.25 | | " | Mar. 20, 2017 | Mar. 22, 2017 |

| LG Capital Note ID | Principal Amount | OID or Other Discount at Time of Acquisition | SPA (DPA) Date | Issue Date | Funded Date |
|---|---|---|---|---|---|
| FREE-2NN | $ 50,000 | | Apr. 20, 2016 | Apr. 20, 2016 | Apr. 21, 2016 |
| FREE-3NN | $ 45,000 | | Jan. 20, 2017 | Jan. 20, 2017 | Jan. 30, 2017 |
| FREE-4NN | $ 45,000 | | " | Mar. 20, 2017 | Mar. 22, 2017 |
| FREEF-5NN | $ 39,500 | | July 21, 2017 | July 21, 2017 | July 24, 2017 |
| FREEF-6NN | $ 37,500 | | Aug. 17, 2017 | Aug. 17, 2017 | Aug. 24, 2017 |

53.     Lerman authorized LG Capital to fund at least four of the five notes that it purchased directly from FreeSeas (FREEF-2NN to -6NN). He instructed LG Capital's bank to wire the funds to FreeSeas, less any OID, and attorneys' fees which were paid by FreeSeas from the note proceeds.

54.     Lerman also authorized LG Capital to wire payments for the three aged notes that it purchased from third parties. For example, on or about January 20, 2017, Lerman executed a Debt Purchase Agreement with a Greek law firm, pursuant to which LG Capital acquired a convertible note that FreeSeas had issued to the firm on August 16, 2016. The acquired note had $107,601 of principal and accrued interest remaining. Lerman initiated the payments for the note, which were wired in two installments of $55,998.24, to a bank in Cyprus held by a Greek shipping company. In exchange, FreeSeas exchanged the aged convertible note with two replacement convertible notes to LG Capital.

55.     All eight FreeSeas convertible notes had an 8% rate of interest and a one-year maturity. LG Capital was entitled to convert each note, in full or part, into shares of FreeSeas common stock, at a **35% discount** to the market. The conversion right could be exercised at any time. Each note set forth a conversion equation that established LG Capital's acquisition price at 65% of the **lowest trading price** of FreeSeas common stock for the **20** trading days prior to and

including the date on which the notice of conversion is received. LG Capital was entitled to an additional 10% discount on the conversion price if certain conditions existed on the conversion date. FreeSeas had no right of redemption under the replacement notes or after 180 days on the other notes; and, prior to 180 days, any redemption would subject FreeSeas to penalties, ranging from 118% to 148% of the principal plus accrued interest.

56.    In all, LG Capital converted five of the eight FreeSeas notes – FREE-1AD, -2AD, -3AD, -2NN, and -3NN. There were 66 conversions in all, resulting in LG Capital's acquisition of more than 800 million newly issued shares of FreeSeas common stock.

57.    Lerman and an LG Capital employee acting under his delegated authority executed the conversion notices, with Lerman executing all notices on and after March 20, 2017, or 36 of the 66.

58.    In connection with every incremental conversion of the FreeSeas notes, and depending on which of them had signed the conversion notice, Lerman and the employee also executed documents needed to deposit LG Capital's post-conversion shares into LG Capital's brokerage accounts. Lerman was a primary contact on LG Capital's accounts.

59.    Over the course of 145 trade dates, LG Capital resold its unrestricted, newly issued shares of FreeSeas common stock into the public markets for proceeds of more than $525,000. LG Capital's trades represented more than 20% of FreeSea's daily trading volume on 73 of the 145 days (approximately 50% of the trading days).

60.    LG Capital did not convert the FreeSeas notes to hold the shares for appreciation, but instead to promptly sell them into the public markets and capture as much of the spread between its discounted acquisition price and the market price as possible. LG Capital typically

took two to three days from the date of the conversion notice to complete the sale of all FreeSeas shares obtained in a conversion.

61.     FreeSeas last filed a report with the SEC on August 3, 2018, when it announced that the company sold its principal asset to a private party in order to satisfy preferred creditors. LG Capital's final three notes with FreeSeas – FREE-4NN and FREEF-5NN and -6NN – were never converted.

## Momentous Entertainment Group, Inc.

62.     From March 22, 2016 through May 18, 2018, Lerman executed securities purchase agreements through which LG Capital acquired 11 convertible note obligations of Momentous Entertainment Group, Inc. ("MEG") (Ticker: MMEG), a Nevada corporation located in Sugar Land, Texas.

63.     MEG was a regular client of LG Capital. LG Capital, acting through Lerman, acquired MEG's notes with an eye toward converting them and distributing newly issued shares MEG's common stock into the public markets.

64.     The following chart lists the convertible notes that LG Capital purchased and funded on or after January 1, 2016:

| LG Capital Note ID | Principal Amount | OID or Other Discount at Time of Acquisition | SPA (DPA) Date | Issue Date | Funded Date |
|---|---|---|---|---|---|
| MMEG-1NN | $ 65,000 | | Mar. 22, 2016 | Mar. 22, 2016 | Mar. 23, 2016 |
| MMEG-2NN | $ 37,000 | | May 13, 2016 | May 13, 2016 | May 17, 2016 |
| MMEG-2BE | $ 37,000 | | " | May 13, 2016 | Nov. 28, 2016 |
| MMEG-3NN | $ 45,675 | | Dec. 12, 2016 | Dec. 12, 2016 | Dec. 13, 2016 |
| MMEG-3BE | $ 45,675 | | " | Dec. 12, 2016 | Aug. 11, 2017 |
| MMEG-4NN | $ 84,263 | $ 5,513 | Jan. 20, 2017 | Jan. 20, 2017 | Jan. 25, 2017 |
| MMEG-4BE | $ 84,263 | $ 5,513 | " | Jan. 20, 2017 | Oct. 2, 2017 |

| LG Capital Note ID | Principal Amount | OID or Other Discount at Time of Acquisition | SPA (DPA) Date | Issue Date | Funded Date |
|---|---|---|---|---|---|
| MMEG-5NN | $ 84,263 | $ 5,513 | Feb. 8, 2017 | Feb. 8, 2017 | Feb. 10, 2017 |
| MMEG-5BE | $ 84,263 | $ 5,513 | " | Feb. 8, 2017 | Nov. 3, 2017 |
| MMEG-6NN | $ 53,763 | $ 3,763 | Aug. 10, 2017 | Aug. 10, 2017 | Aug. 14, 2017 |
| MMEG-7NN | $ 42,800 | $ 2,800 | May 4, 2018 | May 4, 2018 | May 7, 2018 |

LG Capital typically acquired corresponding front-end and back-end notes from MEG under one stock purchase agreement, providing the issuer with funding over time and the LG Capital with notes that could be converted into newly issued shares over time, without the need to negotiate new acquisition terms.

65.     Each front-end note had an 8% rate of interest and a 1-year maturity. After 180 days from the note issue date, LG Capital had the right to convert the note's principal plus interest, in full or part, into shares of MEG common stock, at a **45% discount** (or 50% for MMEG-7NN) to the market. For notes MMEG-1NN to -4NN and -7NN, the right was exercisable immediately upon payment of cash. For notes MMEG-5NN to -6NN, the right was exercisable at any time after 180 days from the issue date. LG Capital was entitled to a conversion price equal to 55% (50% for MMEG-7NN) of the **lowest closing bid price** of MEG common stock for the **20 trading days** prior to and including the date of the conversion notice. LG Capital was entitled to up to 30% of additional discounts (for a total discount of up to 75%) if certain conditions occurred between the issue date and the conversion date. MEG was entitled to redeem the front-end notes up to the 180th day but would be required to pay an increased principal amount ranging from 125% to 145% of the unpaid balance; redemptions were not allowed after 180 days.

66.     Each MEG back-end note had conversion terms similar to its corresponding front-end note; except, LG Capital initially funded back-end notes with an offsetting collateralized secured promissory note (executed by Lerman) as a placeholder. LG Capital's conversion right under the back-end notes was triggered by its payment of cash. But, upon funding the note in cash, LG Capital had the right to convert back-end notes in full or part immediately. Back-end notes had no right of prepayment; and if MEG were to prepay a corresponding front-end note, the corresponding back-end note would be deemed cancelled automatically.

67.     In connection with LG Capital's acquisition of MMEG-5NN through -7NN and MMEG-5BE, MEG also agreed to give LG Capital warrants for no additional consideration, which could be exercised on a cashless basis, at a discount to the market price.

68.     Lerman authorized LG Capital's bank to wire funds to MEG in connection with at least seven of the notes (MMEG-1NN, -2NN, -3BE, -4NN, -4BE, -5BE, -6NN); another managing member of LG Capital authorized funds to be wired on at least three of the notes. Funds were wired to MEG, less any OID, and less attorneys' fees and broker fees which MEG paid from the note proceeds. On at least one occasion, MEG used the proceeds to prepay a convertible note with an unrelated financier.

69.     Between September 26, 2016 and November 11, 2017, LG Capital converted six of the 11 MEG notes – MMEG-1NN, -2NN, -2BE, -3NN, -3BE, and -4NN. The conversions were done in 40 increments. From September 2016 through February 2017, an employee acting under Lerman's delegated authority executed 20 conversion notices; thereafter, Lerman executed the notices required for the remaining 20 conversions. Through these conversions, LG Capital acquired more than 2.4 billion shares of newly issued MEG common stock at a substantial discount to the market price at the time of each conversion.

70.     In connection with every incremental conversion of the MEG notes, and depending on which of them had signed the conversion notice, Lerman and the employee also executed documents needed to deposit LG Capital's post-conversion shares into LG Capital's brokerage accounts, including security deposit agreements, securities deposit request forms, fee acknowledgements, and risk questionnaires. Lerman was a primary contact on LG Capital's brokerage accounts.

71.     LG Capital sold the more than 2.4 billion shares into the public markets, over the course of 135 trading days. On 30 of the 135 dates on which it traded MEG's common stock (or 20% of the time), LG Capital's trades represented 20% or more of the total daily trading volume in MEG's common stock. It received sales proceeds of more than $1 million on these sales.

72.     LG Capital did not convert the MEG notes to hold the shares for appreciation, but instead to promptly sell them into the public market and capture as much of the spread between its discounted acquisition price and the market price as possible. LG Capital typically took one to five days from the date of the conversion notice to complete the sale of all MEG shares received in a conversion.

73.     MEG last filed a periodic report with the SEC on November 20, 2017, when it filed its Form 10-Q for the quarter ended September 30, 2017, a period in which it reported a net loss of $39,919,532, and a negative net worth. With the exception of two trades made in March 2018, LG Capital completed its sale of MEG common stock obtained through its conversion of the six notes.

74.     MEG became non-current in its SEC filings in April 2018.

75.     LG Capital did not convert the remaining notes.

76.     On September 27, 2019, the SEC revoked MEG's Exchange Act registration.

**LG Capital and Lerman Sold Penny Stock**

77.    LG Capital, acting through and under the control of Lerman, acquired tens of billions of unrestricted, newly issued shares of common stock through the conversion of convertible notes it entered into with various issuers. During the period in which LG Capital acquired and held such shares, the shares did not meet any of the exceptions to definition of "penny stock," as set forth in Exchange Act Section 3(a)(51) and Exchange Act Rule 3a51-1. [See 15 U.S.C. § 78c(a)(51); 17 C.F.R. § 240.3a51–1]. Defendants LG Capital and Lerman therefore participated in the offering of penny stocks in connection with the actions undertaken to operate LG Capital's convertible notes business.

**COUNT I**
**Violations of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)]**
**(Against Defendants LG Capital and Lerman)**

78.    The SEC re-alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 77 above.

79.    By engaging in the conduct described above, Defendants made use of the mails or other means or instrumentalities of interstate commerce to effect transactions in, to induce, or to attempt to induce, the purchase and sale of securities for their own account as part of a regular business while not registered with the SEC as dealers, and when Defendant Lerman was not associated with an entity registered with the SEC as a dealer.

80.    By reason of the foregoing, Defendants violated, and unless enjoined will likely again violate, Exchange Act Section 15(a)(1) [15 U.S.C. § 78o(a)(1)].

**COUNT II**
**Control Person Liability for Violations of Exchange Act Section 15(a)(1) [15 U.S.C. § 78t(a)]**
**(Against Defendant Lerman Only)**

81.    The Commission re-alleges and incorporates by reference the allegations in Paragraphs 1 through 80 above.

82.     As set forth in Count I, LG Capital violated Exchange Act Section 15(a)(1) [15 U.S.C. § 78o(a)].

83.     At all relevant times, Lerman controlled LG Capital and was a culpable participant in its violations of Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

84.     By reason of the foregoing, Lerman is liable as a control person, pursuant to Exchange Act Section 20(a) [15 U.S.C. § 78t(a)], for LG Capital's violations of Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

<u>**COUNT III**</u>
**Unjust Enrichment**
**(Against Relief Defendants Gellman, Greenberg, and Safdieh)**

85.     The SEC re-alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 84 above.

86.     Relief Defendants Gellman and Greenberg received periodic distributions from LG Capital, which the company referred to as "partner draws," and were derived from the proceeds of LG Capital's above-alleged securities law violations. Each received distributions of at least $1.8 million. Neither Gellman nor Greenberg have a legitimate claim to such funds received from January 1, 2016 to the present.

87.     Relief Defendant Safdieh received periodic discretionary payments from LG Capital, which were in addition to his salary, which the company referred to as "commissions" and/or "bonuses." In total he received more than $1.1 million of "commissions" or "bonuses." These payments were derived from the proceeds of LG Capital's above-alleged securities law violations. Safdieh has no legitimate claim to any discretionary payments received from January 1, 2016 to the present.

88.     By virtue of the foregoing, Relief Defendants Gellman, Greenberg, and Safdieh were unjustly enriched and, under the circumstances, it is not just, equitable, or conscionable for

Gellman or Greenberg to retain the above-described partner draws or for Safdieh to retain the above-described commissions and/or bonuses.

## **RELIEF REQUESTED**

WHEREFORE, the SEC respectfully requests that this Court enter a Final Judgment:

### **I.**

Finding that LG Capital and Lerman committed the violations alleged herein.

### **II.**

Permanently restraining and enjoining LG Capital and Lerman, as well as their members, managers, agents, servants, employees, attorneys-in-fact and persons in active concert or participating with them, from violations of Exchange Act Section 15(a)(1) [15 U.S.C. § 78o(a)(1)].

### **III.**

Ordering LG Capital and Lerman, jointly and severally, to disgorge, with prejudgment interest, all ill-gotten gains received, directly or indirectly, from the activities set forth in this Complaint, pursuant to Exchange Act 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

### **IV.**

Ordering LG Capital and Lerman to pay civil penalties pursuant to Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)].

### **V.**

Permanently barring LG Capital and Lerman from participating in any offering of any penny stock, including by engaging in activities with a broker, dealer, or issuer for purposes of

issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, pursuant to Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)].

## VI.

Ordering Relief Defendants, Gellman, Greenberg, and Safdieh, to disgorge all ill-gotten gains and/or unjust enrichment received, directly or indirectly, with pre-judgment interest thereon, as a result of the violations alleged in this Complaint, pursuant to Exchange Act 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

## VII.

Granting such other and further relief that this Court deems just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors, including, but not limited to, the ordering the surrender and cancellation of any securities (including convertible notes, warrants, and shares) obtained by LG Capital in connection with its convertible notes business, during the period January 1, 2016 through the present, which are still held by LG Capital.

Respectfully submitted,

Dated:  June 7, 2022
          Washington, DC

SECURITIES AND EXCHANGE COMMISSION

By:  */s/Suzanne J. Romajas*

_____

OF COUNSEL:
Carolyn Welshhans*
Fuad Rana*

*not admitted in E.D.N.Y.*

Suzanne J. Romajas
Elliot J Weingarten* (*pro hac application forthcoming*)
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, D.C. 20549-5971
Tel: 202-551-4473 (Romajas)
Tel: 202-551-7665 (Weingarten)
Email: RomajasS@sec.gov
Email: WeingargtenEl@sec.gov

Attorneys for Plaintiff