UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
SECURITIES AND EXCHANGE                   :
COMMISSION,                               :
                                          :
            Plaintiff,                    :
                                          :
      v.                                  :          __DECISION & ORDER__
                                          :          22-CV-3353 (WFK) (JRC)
LG CAPITAL FUNDING, LLC, *et al.*,        :
                                          :
            Defendants.                   :
-------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

The Securities and Exchange Commission ("SEC" or the "Plaintiff") brings this action against LG Capital Funding, LLC and Joseph I. Lerman (collectively, "Defendants"), as well as Daniel Gellman, Boruch Greenberg, and Eli Safdieh (together, "Relief Defendants") for alleged violations of Section 15(a)(1) of the Exchange Act of 1934, 15 U.S.C. § 78o(a)(1). *See* Compl., ECF No. 1. Before the Court is Defendants' Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Def. Mot., ECF No. 26. For the reasons to follow, Defendants' Motion is DENIED.

1. **Background**

LG Capital Funding, LLC ("LG Capital") is a New York-based limited liability company that exclusively invests the capital of its three principals: Joseph Lerman, a managing partner and 50% owner; Daniel Gellman, a managing partner and 25% owner; and Boruch Greenberg, also a managing partner and 25% owner. Compl., ECF No. 1 at ¶¶ 12-15.[1]

On June 7, 2022, the Securities and Exchange Commission ("SEC" or "Plaintiff") filed a complaint against Defendants LG Capital and Lerman (collectively, "Defendants"), as well as against Daniel Gellman, Boruch Greenberg, and Eli Safdieh (together, "Relief Defendants") for alleged violations of Section 15(a)(1) of the Exchange Act of 1934, 15 U.S.C. § 78o(a)(1) ("Exchange Act" or the "Act"). *See id.* The Complaint generally alleges Defendants acted as

---

[1] Page references in this Decision and Order correspond with ECF paginations and not to the cited document's internal page numbers.

1

securities dealers, engaged in the business of buying and selling large volumes of penny stocks (a type of security)[2] for their own account, without being registered with the SEC and without Defendant Lerman, LG Capital's control person, associating with an SEC-registered dealer.  *Id.* ¶¶ 1, 17; *see* 15 U.S.C. §§ 78o(a), (b) (requiring "dealers," as defined in 15 U.S.C. § 78c(a)(5)(A), effecting transactions in or attempting to induce the purchase or sale of securities, except when transacting in certain exempted securities, to register with the SEC).

Specifically, the SEC claims "LG Capital's business model – which was carried out under Lerman's direction and control – involved purchasing convertible promissory notes from penny stock issuers for the exclusive benefit of Lerman and its two other principals," often by executing debt purchase agreements ("DPAs") or stock/securities purchase agreements ("SPAs"), and by "later converting those notes into unrestricted, newly issued shares of penny stocks at a substantial discount to the then-prevailing market price … and [quickly re-selling] the post-conversion shares into the public markets to capture the benefit of the discount."  *Id.* ¶¶ 2, 22.  Plaintiff further alleges that between January 1, 2016 and December 31, 2021, Defendants bought or funded roughly 330 convertible notes from more than 100 different penny stock issuers and converted approximately 150 of these 330 notes into 23 billion unrestricted, newly issued shares of common stock, a portion of which Defendants sold. *Id.* ¶¶ 1, 3-4, 17, 19, 33, 35, 77.  Altogether, Plaintiff claims Defendants' post-conversion sale of shares generated at least $30 million in proceeds and roughly $20 million in profits.  *Id.*; *see also id.* ¶¶ 37-76 (highlighting how LG Capital allegedly purchased and funded convertible notes, exercised its conversion rights, and sold the resulting unrestricted, newly issued shares into the public markets for significant profits, and specifically recounting Defendants'

---

[2] *See* Exchange Act § 3(a)(51) and Exchange Act Rule 3a51-1.  15 U.S.C. § 78c(a)(51); 17 C.F.R. § 240.3a51–1 (defining "penny stock"); *see also* Compl. ¶ 77.

transactions with Medifirst Solutions, Inc., FreeSeas, Inc., and Momentous Entertainment Group, Inc.).

In light of the above, Plaintiff alleges Defendants "made use of the mails or other means or instrumentalities of interstate commerce to effect transactions in, to induce, or to attempt to induce, the purchase and sale of securities for their own account as part of a regular business while not registered with the SEC as dealers, and when Defendant Lerman was not associated with an entity registered with the SEC as a dealer[,]" in violation of the Exchange Act. *Id.* ¶ 79.  Plaintiff also alleges Relief Defendants were unjustly enriched by virtue of Defendants' securities violations. *Id.* ¶¶ 85-88.

On October 27, 2022, Defendants moved to dismiss the SEC's Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Def. Mot., ECF No. 26.  In support of their Motion, Defendants argue (1) the instrument at issue here—convertible redeemable notes—are not securities, and (2) LG Capital is not a "broker" or a "dealer" within the meaning of the Act and thus Defendants are exempt from the SEC's registration requirements pursuant to 15 U.S.C. § 78o(a)(5)(B). *See generally* Def. Mem., ECF No. 27.  Defendants also argue the related SEC enforcement actions Plaintiff cites as analogous are both distinguishable from this case and nonbinding on this Court; the Complaint constitutes impermissible rulemaking by enforcement and thus deprives Defendants of due process; and the "Major Questions Doctrine" precludes the Court from reviewing the Complaint. *Id.; see also* Def. Supp. Authority, ECF No. 52; Pl. Supp. Authority, ECF No. 53; Def. Rep. to Pl., ECF No. 54.

Prior to this Court rendering a decision on Defendants' Motion to Dismiss, Alternative Investment Management, Ltd., National Association of Private Fund Managers, and Trading and Markets Project, Inc. (collectively, "Amici") moved for leave to file as amici in support thereof.

ECF No. 39 (filed on July 13, 2023).  The Court granted Amici's Motion over Plaintiff's objection, *see* Amici's Mot., ECF No. 46; Plaintiff's Opposition to Amici's Mot., ECF No. 44; Amici's Reply, ECF No. 45, and on July 27, 2023, Amici filed in support of Defendants, *see* Amici Mem., ECF No. 47.

Amici did not address Defendants' first argument, which is to say, Amici did not opine on whether the convertible redeemable notes at issue here are securities within the meaning of the Act.  *Id.*  However, Amici did raise three points with respect to Defendants' second claim, relating to the Act's "broker-dealer" requirement.  Their arguments are: (1) investment advisors and funds, such as LG Capital, operate and are regulated differently from dealers; (2) the Court should hold that, within the meaning of the Exchange Act, a "dealer" executes customer orders "as part of a regular business"; and (3) at a minimum, the Court should render a decision grounded in the SEC's published guidance on how to distinguish "dealers" from registered investment advisors and funds. *See id.*

Plaintiff filed in opposition to Amici's Motion on August 25, 2023,  Pl. Resp. to Amici, ECF No. 48, and Amici filed a reply on September 8, 2023, Amici Resp., ECF No. 50.

For the reasons set forth below, Defendants' Motion to Dismiss is DENIED.

## 2. Legal Standard

To survive a motion to dismiss "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 102 (2d Cir. 2022) (quoting *Lynch v. City of New York*, 952 F.3d 67, 74 (2d Cir. 2020) (referencing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009))); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (establishing this proposition).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Vengalattore*, 36 F.4th  at 102.

"The plausibility standard under Rule 12(b)(6) requires more than a sheer possibility that a defendant has acted unlawfully." *Han v. Shang Noodle House, Inc.*, 20-CV-2266, 2022 WL 4134223, at *3 (E.D.N.Y. Sept. 12, 2022) (Chen, J.). "[D]etermining whether a complaint meets this standard is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (referencing *Vengalattore*, 36 F.4th at 102 (applying *Iqbal*, 556 U.S. at 678–79)).

In considering a motion to dismiss, courts must accept all of the nonmovant's factual allegations as true and draw all reasonable inferences in the nonmovant's favor. *Twombly*, 550 U.S. at 555. However, reviewing courts are "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). A complaint must be dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. To be clear, a court should dismiss a complaint only where it seems beyond doubt the plaintiff "can prove no set of facts in support of his claim which would entitle him to relief." *Jacobs v. Ramirez*, 400 F.3d 105, 106 (2d Cir. 2005) (internal citations omitted).

Lastly, when deciding a motion to dismiss, courts are entitled to consider both exhibits attached to the complaint and documents "integral" to and relied upon in the complaint, even if not attached or incorporated by reference. *See Blue Apron Holdings Sec. Litig.*, 2020 WL 1950783, at *1 (E.D.N.Y. Apr. 22, 2020) (Kuntz, J.) (citing *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007)).

### 3. <u>Analysis</u>

Defendants raise two primary arguments in support of their Motion to Dismiss. *See generally* Def. Mot. First, Defendants argue the convertible redeemable notes subject to the SEC's Complaint are not securities but rather loans, and thus the SEC lacks jurisdiction to pursue the

instant claims. *Id.* Second, Defendants argue LG Capital is neither a broker nor dealer, and thus Defendants are exempt from the Exchange Act's registration requirements. 15 U.S.C. § 78o; 78c. *Id.* . The Court addresses each claim in turn and ultimately finds Plaintiff has plausibly asserted (1) the convertible notes with which Defendants transacted are securities, and (2) Defendants acted as "dealers" within the meaning of the Act and thus were required to comport with the SEC's registration requirements.

### a. Plaintiff Plausibly Asserts Convertible Notes are Securities Within the Meaning of the Exchange Act

The SEC argues Defendants bought and sold "securities" by entering into and executing agreements with issuers for convertible redeemable notes in exchange for loans. Pl. Mem. at 9 (referencing Compl. ¶¶ 1-2, 6, 17, 22, 24-26, 29-30, 32-33, 40, 49, 52, 62, 64)); *see also id.* at 13-19 (detailing this argument further). In particular, Plaintiff claims Defendants purchased "securities" by agreeing to purchase "common stock" or "notes," typically through the use of SPAs and DPAs. *Id.* at 15 (referencing Compl. ¶¶ 6, 22, 24, 37, 40, 49, 52, 62, 64); *see also* Romajas Decl. Ex. 1., ECF No. 29 (Defendants' SPA with Medifirst Solutions, Inc., dated January 6, 2016 ("the Medifirst SPA").[3] Accordingly, Plaintiff argues the underlying convertible redeemable notes meet the Exchange Act's definition of "security." *See* 15 U.S.C. §§ 78c(a)(10) (the Exchange Act's definition of "security" includes "any…stock" and "any note" except those "which have a maturity at the time of issuance of not exceeding nine months[,]" which do not include those at issue here); *see also* 15 U.S.C. § 78c(a)(13) (defining "buy" and "purchase"); *id.* § 78c(a)(14)

---

[3] In the Medifirst SPA, the Defendants stipulate to "purchasing the Note and the shares of Common Stock issuable upon conversion of or otherwise pursuant to the Note." Romajas Dec. Ex. 1 at LGCF004663 (¶2.a). *See also id.* at LGCF004665 (¶¶ 2.b; 2.c; 2.f. (the SPA defines the note and common stock as "securities")).

(defining "sale" and "sell") (for the proposition the Act considers "any contract to buy, purchase, or otherwise acquire" a security the equivalent of buying a security); *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 693 (1985) (noting common stock is "the quintessence of a security").

Defendants counter this assertion by claiming the convertible redeemable notes Plaintiff cites are traditional loans rather than securities. Def. Mem. at 12-19. In so saying, Defendants rely primarily on the New York Court of Appeals' decision in *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320 (2021) and the United States Supreme Court's decision in *Reves v. Ernst & Young*, 494 U.S. 56 (1990). *Id.*

For the reasons to follow, the Court finds Plaintiff has plausibly asserted Defendants bought and sold "securities," contrary to Defendants' arguments and interpretation of *Adar Bays* and *Reves*.

> i. *Adar Bays*

Defendants cite extensively to the New York state court's decision in *Adar Bays*, 37 N.Y.3d 320 to support their argument convertible redeemable notes are not securities. *See generally* Def. Mem. Defendants' reliance on this case is misplaced.

The *Adar Bays* litigation ensued after a corporate lender brought an action against a corporate borrower alleging breaches of a securities purchase agreement and convertible redeemable note under New York law. *See generally Adar Bays*, 37 N.Y.3d. The *Adar Bays* plaintiff initially filed the action in the United States District Court for the Southern District of New York, which ultimately granted summary judgment in favor of the lender. *Adar Bays, LLC v. GeneSYS ID, Inc.*, 341 F. Supp. 3d 339 (S.D.N.Y. 2018) (Carter, Jr., J.). The borrower appealed, prompting the United States Court of Appeals for the Second Circuit to certify two questions to the state court, the New York Court of Appeals, given the applicability of state law: "'[First,] [w]hether a stock conversion option that permits a lender, in its sole discretion, to convert any

7

outstanding balance to shares of stock at a fixed discount should be treated as interest for the purpose of determining whether the transaction violates N.Y. Penal Law § 190.40, the criminal usury law[;]" and "[second,] [i]f the interest charged on a loan is determined to be criminally usurious under N.Y. Penal Law § 190.40, whether the contract is void ab initio pursuant to N.Y. Gen. Oblig. Law § 5–511." *Adar Bays, LLC v. GeneSYS ID, Inc.*, 962 F.3d 86, 94 (2d Cir. 2020). In response, the New York Court of Appeals determined: "(1) the value of a floating-price option entitling a lender to convert some of the loan balance to equity should be included in a calculation of a loan's interest rate when determining if that rate is usurious; and (2) a loan with interest that exceeds New York's 25% criminal usury rate is void and unenforceable." *Adar Bays, LLC v. GeneSYS ID, Inc.*, 28 F.4th 379, 380 (2d Cir. 2022). The Second Circuit subsequently vacated the Southern District's decision and remanded the case for further proceedings in line with the state court's response. *Id.*

Defendants now argue, based on their interpretation of the New York Court of Appeals' decision, "a stock conversion option on a loan should be treated as interest on a loan" and thus that "convertible redeemable notes, like the ones LG Capital is a party to and at issue in the SEC's Complaint, are *loans and not investments*" and are therefore outside the Act's scope. Def. Mem. at 13 (emphasis in original) (referencing *Adar Bays*, 37 N.Y.3d at 335 ("The presence of a floating-price conversion option does not transform a loan into an equity investment. The conversion option was an intrinsic part of the consideration *Adar Bays* received for the loan.")); *Seidel v. 18 E. 17th St. Owners, Inc.*, 79 N.Y.2d 735, 744 (1992) (finding floating-price convertible redeemable notes to be loans)).

Plaintiff disagrees with this assertion and challenges the applicability of *Adar Bays* altogether. Pl. Mem. at 20. It does so on the grounds "the New York Court of Appeals did not

consider whether the convertible note at issue in [*Adar Bays*] was a 'security' for the purposes of the federal securities laws." *Id.* (noting the state court exclusively applied New York's usury law); *see also id.* at 20, n.11 (arguing *Seidel*, 79 N.Y.2d 735 contains the same limitation).  The Court agrees with Plaintiff.

The definition of a "security" within the meaning of the federal securities laws[4] and New York state usury law is not one and the same.  The Second Circuit noted as much in *Highland Cap. Mgmt. LP v. Schneider*, in which the Circuit not only recognized discrepancies in the definition of "security" across various state law provisions but also noted the same as between state and federal law.  *See* 460 F.3d 308, 309-10, 319 (2d Cir. 2006),[5] *certified question accepted,* 7 N.Y.3d 836 (2006), and *certified question answered*, 8 N.Y.3d 406, (2007); *id.* at 317 (explaining "the few New York cases that have addressed ['the lack of congruence between the [state] regulatory definition of a security and the [New York Uniform Commercial Code] definition of a security'] have said that the definition of a 'security' for purposes of the New York U.C.C. is more narrow than the definition of a 'security' for federal and state regulatory purposes." and comparing the definition of a 'security' under the New York U.C.C. and other New York state law provisions, namely the Martin Act, N.Y. Gen. Bus. Law § 352(1), as well as between New York and federal law, specifically, the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.* and the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*).  *See also ALH Props. Ten, Inc. v. 306–100th St. Owners Corp.*, 191 A.D.2d 1, 9 (1st Dep't 1993) (cautioning the statutory definition of "security" contained

---

[4] The Exchange Act defines federal "securities laws" to mean the Securities Act of 1933, 15 U.S.C. 77a *et seq.*, the Securities Exchange Act of 1934, 15 U.S.C. 78a *et seq.*, the Sarbanes-Oxley Act of 2002, 15 U.S.C. 7201 *et seq.*, the Trust Indenture Act of 1939, 15 U.S.C. 77aaa *et seq.*, the Investment Company Act of 1940, 15 U.S.C. 80a–1 *et seq.*, the Investment Advisers Act of 1940, 15 U.S.C. 80b *et seq.* [15 U.S.C. 80b–1 *et seq.*], and the Securities Investor Protection Act of 1970, 15 U.S.C. 78aaa *et seq.*  *See* 15 U.S.C. 78c(a)(47).

[5] The case was on appeal from the Southern District of New York, which ruled on summary judgment that the notes at issue were not "securities" under state law.  *Highland Cap. Mgmt., L.P. v. Schneider*, 02-CV-8098, 2005 WL 1765711 (S.D.N.Y. July 26, 2005) (Leisure, J.).

in Section 8–102(15) of the New York U.C.C. is not identical to the term "security" as used in the context of federal and state securities regulation).  *See also Burrus v. Vegilante*, 336 F.3d 82, 89 (2d Cir. 2003) (noting, even as between the federal securities laws, there are textual differences and conflicting meanings and that "[w]here the words of a later statue differ from those of a previous one on the same or related subject, the Congress must have intended them to have a different meaning."); *id.* (comparing the definition of "dealer" under the Securities Act of 1933, 15 U.S.C. 77a *et seq.* with the definition of "dealer" in the Securities Exchange Act of 1934, 15 U.S.C. 78a *et seq.*).  *See also Wis. Cent. Lt. v. SEC*, 138 S. Ct. 2067, 2071 (2018) (articulating a general presumption that differences in language between companion statutes convey differences in meaning); Amici Mem. at 26 (collecting cases in support of the proposition a word may have one meaning in a certain regulatory space and a different meaning in another).

This Court recognizes there are some factual similarities between *Adar Bays* and the case at hand.  *See* Def. Mem. at 14 (noting the existence of an SPA between a corporate lender and a corporate borrower—a microcap company similar to those with which Defendants dealt—and further explaining the *Adar Bays* borrower extended to the lender a convertible redeemable note with a floating-price option in exchange for a loan, similar to Defendants' transactions here).  However, the New York Court of Appeals decision finding the convertible notes to be loans rather than investments, including securities, was not rooted in federal securities law, which is the only law governing this case.  *See Adar Bays*, 37 N.Y.3d at 335.  Therefore, the Court agrees with Plaintiff: *Adar Bays* is inapposite here.  *See* Pl. Mem. at 20.

ii.  *Reves*

Defendants next argue convertible redeemable notes are not securities consistent with the Supreme Court's analysis in *Reves v. Ernst & Young*, 494 U.S. 56.  *See* Def. Mem. at 17.

In *Reves*, the Supreme Court articulated a test by which courts determine whether an instrument, namely, a note of sorts, falls within the Exchange Act's "security" definition. *See generally Reves*, 494 U.S. at 62-66. The Court prefaced its analysis by noting Congress enacted the Act intending the term "security" to be broadly construed. *See id.* at 62 ("Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called."). The Court then explained, based on the fact the Act expressly includes "any note" within the definition, there is a rebuttable presumption *all* notes are securities. *Id.* (emphasis added); *see also* 15 U.S.C. § 78c(a)(10) (defining "security"). That is, the Court explained, unless the note in question "bears a strong resemblance," as determined by examining the four factors identified by the Second Circuit in *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1137 (2d Cir. 1976), to an item on the judicially crafted list of categories of instruments that are not securities. *Reves*, 494 U.S. at 56, 67 ("[The presumption that a note is a security] may be rebutted only by a showing that the note bears a strong resemblance (in terms of the four factors [enumerated in *Exchange Nat'l Bank*]) to one of the enumerated categories of instrument."). "If an instrument is not sufficiently similar to an item on the list, the decision whether another category should be added is to be made by examining the same factors." *Id.*

Included among the judicially crafted list of categories of instruments that are not securities are: (1) notes used for consumer financing and mortgages, (2) short-term notes secured by liens on small businesses or its assets, (3) "character" loans, (4) short term notes secured by accounts receivable, and (5) notes formalizing open-account debt incurred in the ordinary course of business. *Exchange Nat'l Bank*, 544 F.2d at 1138. To determine whether an instrument bears a strong resemblance to the aforementioned categories, the four factors to consider are: (1) "the

motivations that would prompt a reasonable seller and buyer to enter into [a transaction]"; (2) "the "plan of distribution" of the instrument…to determine whether it is an instrument in which there is common trading for speculation or investment"; (3) the reasonable expectations of the investing public"; and (4) "whether some factors such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering the application of the Securities Acts unnecessary." *Id.* at 67 (referencing *Landreth Timber Co.*, 471 U.S. at 687, 693; *Marine Bank v. Weaver*, 455 U.S. 551, 557-59, and n.7 (1982); *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837 (1975); *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 353 (1943)).

Defendants argue an analysis of all four factors weighs in favor of finding the convertible redeemable notes bear a resemblance to the categories of notes courts have long deemed not to be securities. Def. Mem. at 17-19. Plaintiff counters Defendants' assertion and claims this analysis militates in favor of finding the convertible notes to be securities. Pl. Mem. at 20. In so saying, Plaintiff also notes the burden to rebut the presumption the convertible redeemable notes are securities lies with Defendants—a burden which Plaintiff argues Defendants have not met. *Id.* at 20 (referencing *Schentag v. Nebgen*, 2018 WL 3104092, at *8 (S.D.N.Y. Jun. 21, 2018) (Woods, J.); *Leemon v. Burns*, 175 F. Supp. 2d 551, 559 (S.D.N.Y. 2001) (Peck, M.J.)). In assessing the four *Exchange Nat'l Bank*, the Court finds in line with Plaintiff.

### 1. Motivation of the Parties to the Note

The Complaint does not present factual allegations as to *why* or *how* the issuers intended to use the funds they received from Defendants in exchange for the notes. *See generally* Compl. Instead, the Complaint simply states Defendants "purchased convertible notes (a type of security) from penny stock issuers in need of cash[.]" *Id.* ¶ 6. The Court cannot infer the "approximately 330 convertible notes," *id.* ¶ 19, Defendants purchased from the "more than 100 penny stock

issuers," *id.*, were intended to "solve" or "correct" each issuer's "cash flow difficulties" or whether they were otherwise used by the issuers as a "temporary" source of capital investment such that the notes would appear designed to serve some "commercial or consumer purpose" rather than function as an investment. *See* Def. Mem. at 16 (citing *Reves,* 494 U.S. at 66; *Singer v. Livoti*, 741 F. Supp. 1040, 1050 (S.D.N.Y. 1990) (Brieant, J.); *Benedict v. Amaducci*, 1995 WL 413206, at *9 (S.D.N.Y. Jul. 12, 1995) (Wood, J.)).  In fact, the Complaint alleges to the contrary—that Defendants sought long-term business relationships with issuers as part of their investment strategy. *Id.* ¶¶ 1-2, 17,  25, 28-30, 33; *see also* Pl. Mem. at 21-22 (detailing this argument); *id.* ¶ 22 ("Many of the stock purchase agreements provided for LG Capital to purchase and fund multiple notes from the issuer on a set schedule."); *id.* ¶ 40 (Defendants often acquired multiple notes through one SPA that could be converted into shares over time without requiring LG Capital to renegotiate new terms); *id.* ¶ 64 (demonstrating the same).  Therefore, the Court finds in favor of Plaintiff on this point.

2.  <u>Plan of Distribution</u>

An instrument's plan of distribution, including whether it was "offered and sold to a broad segment of the public," is indicative of whether that instrument is a security.  *Intelligent Dig. Sys., LLC v. Visual Mgmt. Sys., Inc.*, 683 F. Supp. 2d 278, 285 (E.D.N.Y. 2010) (Wexler, J.).  Courts have found "restrictions on the marketing of certain loan participations strongly suggests" the instrument is not a security. *Kirschner v. JP Morgan Chase Bank, N.A.*, 79 F.4th 290, 306 (2d Cir. 2023) ("This factor weighs against determining that a note is a security if there are limitations in place that work to prevent the notes from being sold to the general public.") (internal quotation marks and alterations omitted) (referencing *Banco Espanol de Credito v. Sec. Pac. Nat. Bank*, 973 F.2d 51, 55 (2d Cir. 1992)); *see also* Def. Mem. at 17.

However, it is important for courts to consider the entire transaction when assessing an instrument's plan of distribution. *Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 813 (2d Cir. 1994). It may be the case that in some instances when "only institutional and corporate entities were solicited," and "detailed individualized presentations were made to potential purchasers and resales were prohibited without the express written permission of the broker," the plan of distribution evinces an instrument is not a security. *Id.* But this is not always so. *Id.* (finding the plan of distribution militated in favor of finding the instrument a security and distinguishing the *Banco Espanol* Court's distribution plan rationale, in which the Second Circuit considered it important that the parties' agreement prohibited resales of the instrument without both parties' express written consent).

As the *Pollack* Court explained, unlike the marketing scheme in *Banco Espanol*, which "was more analogous to a group of highly sophisticated commercial entities engaging in short-term commercial financing arrangements than to the securities markets[,]" *id.* at 813, "even if an underlying instrument is not a security, the manner in which participations in that instrument are used, pooled, or marketed might establish that such participations are securities." *Id.* at 814 (citing *Banco Espanol*, 973 F.2d at 56; *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 240-42 (2d Cir. 1985)). *But see Kirschner*, 79 F.4th at 306 (finding notes were not securities on the grounds they were only offered to "sophisticated institutional entities," who were "provid[ed] with a Confidential Information Memorandum" and on the grounds the defendant allocated the notes "to *only* the sophisticated institutional entities that submitted legally binding offers[,]" and the transacting parties agreed to impose significant limitations on the secondary market for the notes) (emphasis in original).

As with *Pollack* and unlike *Banco Espanol*, this Court finds the instant Complaint does not allege such limitations.  To the contrary, Plaintiff exhibited specific SPAs which demonstrate the limitations noted above were not present in at least some of Defendants' agreements, and which further detail the extent to which Defendants were able to transact with the broader public in the secondary market once the notes were converted to common stock.  *See* Compl. ¶ 33 ("LG Capital converted at least 150 notes (or 45%) of approximately 330 convertible notes it funded, and sold more than 23 billion unrestricted, newly issued shares of common stock into the public markets, generating approximately $30 million gross stock sale proceeds"); *id.* ¶ 21 ("LG Capital developed a reputation in the convertible note space, issuers reached out to [LG Capital] directly, or through brokers and finders, to solicit LG Capital's interest in making convertible note investments."); *id.* ¶¶ 25-26 ("The notes that LG Capital purchased and funded during the Relevant Period contained terms that gave LG Capital the right to convert the principal and accrued interest, in full or in part, into shares of the issuer's common stock at a substantial discount to the prevailing market price…The notes discouraged issuers from repaying the note in cash before maturity."); *see also id.* ¶¶ 3, 27 44, 46, 56, 69, 71; the Medifirst SPA (providing an example of some restrictions placed on Defendants' ability to assign the Agreement or engage in secondary market activity).  Thus the Court disagrees with Defendants and finds Plaintiff has plausibly alleged Defendants' plan of distribution indicates they were transacting in securities.

### 3. The Reasonable Perception of the Investing Public

The third factor looks to whether the investing public would reasonably expect the instrument to be a security.  *Reves*, 494 U.S. at 69.  Defendants argue the "restrictive legend" accompanying each note, which generally states "the note and the common stock issuable upon conversion of this note have not been and will not be registered with the [SEC] pursuant to an

exemption from registration[,]" suggests the public would not perceive the notes to be securities. Def. Mem. at 18 (referencing Compl. ¶ 17). This argument is flawed.

It is clear from the restrictive legends and the SPAs referenced in the Complaint—or those documents incorporated by reference therein—that the public would read these documents (1) to suggest Defendants were engaged in securities transactions and (2) to caution that Defendants' transactions were exempt from SEC Rule 144's registration requirements.[6] *See* Compl. ¶ 17; the Medifirst SPA at A. ("The Company and the Buyer are executing and delivering this Agreement in reliance upon the exemption from securities regulation afforded by the rules and regulations as promulgated by the [SEC] under the Securities Act of 1933…"). It is precisely because it is plausible that members of the public, based on their reasonable interpretations of Defendants' agreements, would perceive Defendants to have been transacting in securities—exempted or otherwise—that the Court finds this factor weighs in Plaintiff's favor. *See also Bongiorno v. Baquet*, 20-CV-7288, 2021 WL 4311169, at *17 (S.D.N.Y Sept. 20, 2021) (Liman, J.) (finding for the plaintiff on this *Reves* factor and explaining "from the Amended Complaint's allegations that [plaintiff] consulted his investment advisor and from its references to the instruments as an investment, the most plausible inference is that [plaintiff] reasonably believed he would be protected by the federal securities laws.").

4.   Alternate Regulatory Schemes or Other Risk Reducing Factors

The fourth and final *Reves* factor instructs the Court to consider whether there exists an alternative regulatory scheme that would reduce "the risk of the instrument, thereby rendering the

---

[6] SEC Rule 144 provides safe harbor for certain transactions in the secondary market which involve restricted securities. 17 C.F.R. § 230.144(b). Namely, this Rule removes the resale restriction on privately acquired restricted stocks following a designated holding period and provides safe harbor for the unregistered sale of restricted securities by identifying certain conditions under which a person will be deemed to not be a statutory underwriter. *Id*; *see also SEC v. Kern*, 425 F.3d 143, 148 (2d Cir. 2005) (discussing amendments to the Rule).

application of the Securities Acts unnecessary." *Reves*, 494 U.S. at 67.  Defendants argue the convertible debt market is subject to state usury laws, and they point out the notes are collateralized with shares of company stock, which together, they claim, reduce the risk to the note holder.  Def. Mem. at 19 (referencing *Adar Bays*, 37 N.Y.3d; *Bass v. Janney Montgomery Scott, Inc*., 210 F.3d 577, 585 (6th Cir. 2000)).  Plaintiff pushes back, arguing the New York State's usury laws do not provide sufficient protection "to render unnecessary the application of the federal securities laws to" these convertible notes.  Pl. Mem. at 21.

The Court finds Plaintiff has plausibly asserted there was inadequate alternative regulation over Defendants' convertible notes such that the application of the federal securities laws would not be futile.  *See Pollack*, 27 F.3d at 814-15 ("[W]e do not decide whether state law can be the source of such alternative protection, although it is true that the cases on which *Reves* relied in discussing this factor, 494 U.S. at 69…did involve alternative schemes of federal regulation." (referencing *Marine Bank v. Weaver*, 455 U.S. 551, 558 (1982) (considering federal regulation of banks and FDIC insurance); *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 569–70 (1979) (considering ERISA))).  To begin, the Complaint does not allege the notes were collateralized with common stock through a conversion feature in order to protect Defendants against issuers failing to repay.  Rather, it claims Defendants tended to convert the notes before maturity, while the issuer was prohibited from repaying, without regulatory oversight, and that Defendants undertook measures to skirt enforcement pursuant to 17 C.F.R. § 230.144 ("SEC Rule 144").  *See id.* ¶ 17 ("LG Capital typically held a note for six months, or until such time as it could claim the SEC Rule 144 exemption from registration. LG Capital then began to convert each note into unrestricted, newly issued shares of the issuer's common stock…[s]oon after the receipt of the post-conversion shares—and before the benefit of its negotiated discount dissipated—it began

17

to sell the shares to the public market…"); *id.* ¶ 29 ("LG Capital timed its conversions in an attempt to satisfy the holding periods specified in SEC Rule 144 to remove the resale restrictions on the securities."); *id.* ¶¶ 41-42 (describing Defendants' conversion practice and the issuer's limited redemption rights, which expired after 180 days); *id.* ¶ 55 (same); *id.* ¶¶ 65-66 (same)).  As Defendants have failed to show the existence of an alternative regulatory scheme that would render the application of federal securities laws unnecessary, the Court finds, as it did for the first three *Reves* factors, the fourth factor weighs in Plaintiff's favor.  The Court therefore also finds Plaintiff has plausibly alleged the convertible redeemable notes underlying this case are "securities" within the meaning of the Exchange Act.

The next issue, whether Defendants were "dealers" within the meaning of the Act or were otherwise exempt from the SEC's registration requirements, is more complex and contested amongst the parties.

### b. Plaintiff Plausibly Asserts Defendants were Dealers within the Meaning of the Exchange Act

#### i. The Exchange Act's Definition of a "Dealer"

Section 3(a)(5) of the Exchange Act defines a "dealer" as "any person engaged in the business of buying and selling securities…for such person's own account through a broker or otherwise." 15 U.S.C. § 78c(a)(5)(A); *see also* 15 U.S.C. § 78c(a)(4)(A) (defining "broker") ("The term 'broker' means any person engaged in the business of effecting transactions in securities for the account of others.").  The Act excepts from this definition any "person that buys or sells securities (not including security-based swaps, other than security-based swaps with or for persons that are not eligible contract participants) for such person's own account, either individually or in

a fiduciary capacity, but not *as a part of a regular business*." 15 U.S.C. § 78c(a)(5)(B) (emphasis added).

The crux of the parties' dispute is whether Defendants meet the Exchange Act's definition of a "dealer" or whether they are more aptly characterized as an "underwriter" or "investment advisor"[7] such that they are exempt from the SEC's registration requirements.   Even more specifically, the parties disagree as to whether an entity must effectuate customer orders in order to properly be characterized as a "dealer" within the meaning of the Act.  *Compare* Pl. Mem. at 29; *id.* at 29, n.21; Pl. Resp. to Amici at 14-25 *with* Def. Mem. at 9, 22; Amici Mem. at 16-21.

In particular, Defendants argue LG Capital never acted as a dealer insofar as LG Capital (1) does not regularly buy and sell securities and (2) provides no dealer services.  Def. Mem. at 21-29.  Amici echo Defendants' argument and add (1) registered investment advisors, such as Defendants, operate and are regulated differently from "dealers;" (2) Plaintiff's interpretation of "dealer" contravenes the Exchange Act's text, the SEC's own guidance, and well-established understandings of the meaning of the term; and (3) at a minimum, the Court should ground its decision in the SEC's guidance on how to distinguish "dealers" from registered investment advisors and funds.  Amici Mem. at 11-28.

In response to Defendants, Plaintiff argues Defendants meet the Act's "dealer" definition to the extent Defendants (1) bought and sold securities, including through the purchase and sale of

---

[7] The Exchange Act incorporates the meaning of "investment adviser" and "underwriter" as they are defined in the Investment Advisers Act of 1940, 15 U.S.C. 80b–1 *et seq.  See* 15 U.S.C. § 78c(a)(20).  The Investment Advisors Act defines "investment adviser" as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities…," 15 U.S.C. § 80b-2(a)(11), and it defines "underwriter" as "any person who has purchased from an issuer with a view to, or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking…," 15 U.S.C. § 80b-2(a)(20).

common stocks and convertible notes; and (2) "engaged in the business" of buying and selling securities.  Pl. Mem. at 14-18.  Moreover, in response to Amici, Plaintiff argues *inter alia* (1) the SEC's interpretation of the Exchange Act's "dealer" definition comports with the way courts have interpreted the terms for decades; (2) the statutory definition of "dealer" does not require an individual or entity to execute customer orders; and (3) in the alternative, if dealers are required to have customers, the issuers whose securities Defendants purchased and distributed were its customers.  Pl. Resp. to Amici at 14-30.

It is axiomatic, yet the Court reminds the parties, at this stage of the litigation, Plaintiff does not need to establish the probability of its claims; Plaintiff must merely show it is possible that what it alleges occurred.  *See Desiano v. Warner–Lambert & Co.*, 467 F.3d 85, 89 (2d Cir. 2006) (noting the standard for a 12(b)(6) motion to dismiss "is not akin to a 'probability requirement,' but [rather] asks for more than a sheer possibility that a defendant has acted unlawfully." (quoting *Twombly*, 550 U.S. at 556)); *see also Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (same).  With this standard in mind, the Court finds Plaintiff has plausibly asserted Defendants meet the Exchange Act's "dealer" definition.  This is to the extent the Court finds the Complaint adequately alleges Defendants were engaged in the regular business of buying and selling securities for their own account, and to the extent it finds Plaintiff supports its allegations with a reasonable interpretation of the statute's text and instructive case law.

Plaintiff alleges Defendants bought and sold "securities" for their own account by entering into SPAs with issuers to purchase common stock and convertible notes.  Compl. ¶ 22 ("[Defendants] had developed a regular clientele with which it did repeat convertible note business. More than half of the approximately 100 issuers with which [Defendants] did business during the Relevant Period sold multiple convertible notes to [Defendants] over time. [Defendants]

often contractually locked in this repeat business through stock purchase agreements that were executed by [Defendants]…"); *id* ¶¶ 6, 22, 24, 37, 40, 49, 52, 62, 64; *see also* Romajas Decl. Ex. 1 at LGCF004663 (¶2.a) (setting forth the terms of the Medifirst SPA); *id.* ¶¶ 25-26 (demonstrating how Defendants contracted for and exercised the right to convert notes to shares at a significant discount to market price and how, as a result, Defendants profited roughly $20 million during the relevant period).

Plaintiff also alleges, on numerous occasions, Defendants converted notes, at which time the issuers issued Defendants shares of common stock.  Compl. ¶ 33 ("From 2016 through December 31, 2021, LG Capital converted at least 150 notes (or 45%) of approximately 330 convertible notes it funded, and sold more than 23 billion unrestricted, newly issued shares of common stock into the public markets, generating approximately $30 million gross stock sale proceeds."); *see also id.* ¶¶  1-3, 17, 27-28, 30, 39, 44, 51, 56, 63 (alleging the same); *id.* ¶¶ 36-76 (providing specific examples of Defendants' relationship with three penny stock issuers during the relevant period, which Plaintiff alleges "highlight how [Defendants] purchased and funded convertible notes, exercised its conversion rights, and sold the resulting unrestricted, newly issued shares into the public markets for significant profits.").

Plaintiff alleges further Defendants sold common stock to the public markets.  Compl. ¶ 17 (explaining "[Defendants] purchased convertible notes (a type of security) from penny stock issuers in need of cash, with an eye towards converting the notes into unrestricted newly issued shares, and then distributing the shares into the public markets…To resell the shares into the public markets without restriction, [Defendants] typically held a note for six months, or until such time as it could claim the SEC Rule 144 exemption from registration…" and proceeding to detail the typical process by which Defendants converted the notes); *id.* ¶ 33 ("[Defendants]…sold more

than 23 billion unrestricted, newly issued shares of common stock into the public markets, generating approximately $30 million gross stock sale proceeds."); *see also id.* ¶¶ 1-3, 28, 39, 44, 51, 56, 64. And, Plaintiff alleges, at all times during the relevant period, Defendant LG Capital was not registered as a dealer with the SEC and Defendant Lerman, LG Capital's control person, was not associated with an SEC-registered dealer. *Id.* ¶¶ 1, 12-13.

The Court previously determined *supra* in section 3(a)(i)-(ii) that Plaintiff plausibly alleged the common stock and convertible notes with which Defendants dealt are "securities" within the meaning of the Exchange Act, over Defendants' objection. *See* Def. Mem. at 12-19 (setting forth Defendants' argument that convertible notes are not securities, which the Court rejects at this stage). The Court also notes Defendants do not deny "buying and selling" convertible notes within the relevant period. *Id.* at 22 ("LG Capital used its own money to loan funds to these small businesses, and ... in less than 50% of the time, it sometimes converted the notes to common stock, and sold the securities on the secondary market."). Defendants only contest that the convertible notes were in fact "securities." *See generally id.* Again, as the Court has already rejected this argument for the purposes of assessing Defendants' Motion to Dismiss, the Court now finds, based on its analysis above, Plaintiff has plausibly alleged Defendants bought and sold securities for its own account.

What remains for the Court to decide is whether Defendants bought and sold securities for their own account *as part of their regular business* such that Defendants would be required to meet the Act's dealer registration requirements. *See* 15 U.S.C. § 78c(a)(5)(A) (defining "dealer"); *see also* 15 U.S.C. § 78c(a)(5)(B) (exempting from the registration requirement those entities not engaged in the regular business of buying and selling securities).

It follows that Plaintiff argues Defendants were engaged in the regular business of buying and selling securities. *See* Pl. Mem. at 9 (arguing the Complaint adequately alleges Defendants' business model was to buy and sell securities). Specifically, Plaintiff claims the Complaint clearly alleges "[d]uring the Relevant Period, LG Capital was a conduit through which numerous penny stock issuers brought stock to the public marketplace" and that "[i]ts business model was to: (i) acquire convertible notes through securities purchase agreements ("SPAs"), (ii) wait out a regulatory holding period to exempt the securities from registration with the SEC, (iii) convert the notes into unrestricted, newly issued shares of the issuers' common stock at a substantial discount to the then prevailing market price, and (iv) sell the shares into the public markets, all before the notes had even matured." *Id.* The Complaint adds, "[e]ach transaction significantly increased the issuers' outstanding share totals and, upon LG Capital's sale of the shares, significantly increased the issuers' "public float," or number of shares of common stock held by the public. LG Capital did not hold the shares for appreciation but quickly sold the shares to profit from the spread between the discounted conversion price and the market price at which it sold the stock." *Id.* (internal citations omitted)).

Plaintiff also cites the following allegations in the Complaint to support its argument Defendants were engaged in the regular business of buying and selling securities:

(1) Defendants operate a business, *see* Pl. Mem. at 16-17 ("LG Capital is a business: it has offices [Compl.] ¶ 12, employees (*id.* ¶¶ 21, 23, 28), keeps accounting records (*id.* ¶ 6), and carries on for profit (*id.* ¶¶ 2, 4, 5). And its business model is to buy and sell securities. *Id.* ¶¶ 2, 17.");

(2) Defendants bought and sold securities frequently and at high volumes. *See* Compl. ¶ 3 ("During the Relevant Period, LG Capital purchased or funded approximately 330

convertible notes of more than 100 different penny stock issuers, the majority repeat customers.  It converted at least 150 of the 330 convertible notes into more than 23 billion unrestricted, newly issued shares of common stock – shares that had never traded publicly until LG Capital introduced them into the public markets."); *id.* ¶¶ 19, 24; Romajas Decl. Ex. 1; and

(3) In accordance with their business model, Defendants converted issuer notes to issuer common stock and, rather than hold the issuer's shares for appreciation, Defendants quickly sold them in the secondary market to capture the benefit of the discounted conversion price. *See* Compl. ¶ 4 ("[Defendants'] convertible notes business was lucrative. It generated at least $30 million in gross stock sale proceeds and at least $20 million in profits from its post-conversion sale of shares…"); *id.* ¶ 5 ("In practice, [Defendants] began to sell post-conversion shares soon after each conversion and derived profits principally from the discounted acquisition price, as opposed to appreciation in the market price of the issuer's common stock."); *see also id.* ¶¶ 2-3, 30-31, 33.

Defendants and Amici, on the other hand, argue Plaintiff has failed to allege Defendants engaged in the regular business of buying and selling securities during the relevant period insofar as they claim (1) Plaintiff failed to show Defendants bought and sold the same item, unadulterated from purchase to sale, Def. Mem. at 22, (2) Plaintiff's instant enforcement action contravenes the SEC's own guidance; and (3) Plaintiff failed to allege Defendants bought and sold securities *on behalf of customers*—a requirement, they and Amici argue, courts, the SEC, and the investment community writ large have long read into the Exchange Act's "dealer" definition.  Def. Mem. at

24

27-29 (arguing Defendants are not dealers because they do not transact *on behalf of others*); Amici Mem. at 16-24 (same).[8]  The Court addresses each argument in turn.

Defendants' first argument proceeds as follows: (1) the ordinary meaning of "dealer" at the time Congress enacted the Exchange Act is controlling, Def. Mem. at 22; (2) at the time Congress enacted the Exchange Act, a dealer was one who regularly bought and sold the same item, unadulterated from purchase to sale, *id.* at 22-23 (citing cases from the enacting period—outside the securities regulation context—evincing this understanding); (3) thus, Defendants are not dealers because Defendants did not buy and sell the same item in the same form, *id.* at 23 ("As the SEC alleges, [Defendants] purchase[] notes, and may have in less than 50% of the time, be paid back in stock shares. …[Defendants] do[] not purchase 'securities' at all, rather [they] make[] traditional loans.").

### 1.  The Ordinary Meaning of "Dealer"

The Court is unpersuaded by Defendants' argument.  Rather, it finds, as Plaintiff notes, the cases upon which Defendants rely deal not with the Act's definition of a "dealer"—or even with securities regulation at all.  *See id.* at 22-23 (citing *State v. Yearby*, 82 N.C. 561 (1880) (a tax dispute regarding whether a butcher who buys cattle is liable to be taxed as a "dealer"); *People v. Knickerbocker Ice Co.*, 99 N.Y. 181 (1885) (deciding whether a corporation making ice by artificial means is an ice manufacturer or an ice dealer); *Kalispell Flour Mill Co. v. Marshall*, 125 Wash. 80 (1923) (a breach of contract dispute in which the court found appellant was engaged in the bakery business and was not a dealer in flour); *State v. San Patricio Canning Co.*, 17 S.W.2d

---

[8] In support of their claim Defendants are not "dealers" within the Exchange Act's definition, Amici also argue (1) registered investment advisors and funds are different from dealers to the extent these entities (a) seek returns for investors, (b) are subject to SEC and other regulatory oversight, and (c) are regulated differently from "dealers," Amici Mem. at 11-15; and (2) the SEC's attempt to include Defendants within the Act's "dealer" definition constitutes improper rulemaking (citing SEC Rule 144, 17 C.F.R. § 230.144).

160 (Tex. App. 1929) (finding a shrimp canner was not a dealer in shrimp)). *See also* Pl. Mem. at 26 (countering Defendants' argument here by citing to *SEC v. Carebourn Capital, L.P.*, 21-CV-2114, 2022 WL 1639515, at *6 (D. Minn. May 24, 2022) (Menendez, J.) (rejecting a similar argument, ultimately denying the defendants' 12(b)(6) motion to dismiss, and explaining "[n]one of the [state cases the defendants cite] involved an interpretation or application of the 'dealer' definition from the Exchange Act and they provide no insight into congressional intent in defining what it means for a person to be in the business of buying and selling securities under the relevant statutory language.")); *SEC v. Fife*, 20-CV-5227, 2021 WL 5998525, at *5 (N.D. Ill. Dec. 20, 2021) (Dow Jr., J.) (rejecting the defendants' attempt to cite inapposite case law, denying the defendants' Rule 12(b)(6) motion to dismiss, and explaining "[a]s further support for its position that the 'traditional' meaning of dealer requires that a person buy and sell the same securities in the same condition, Defendants point to a series of contemporary state court decisions which, they maintain, reflect the 'established meaning' of 'buying and selling' which Congress 'replanted' in the Exchange Act…Every other district court to have confronted this issue on similar allegations has allowed the action to proceed past the pleadings stage... Though none of these cases constitutes binding precedent, the Court finds their reasoning persuasive." (internal citations omitted)). In line with what other district courts have similarly held, this Court finds the cases upon which Defendants rely provide little guidance on what the enacting Congress intended the Exchange Act's "dealer" definition to mean. *See also SEC v. Morningview Fin'l LLC*, 22-CV-8142, at 24 (S.D.N.Y. Nov. 7, 2023) (Marrero, J.) (Finding under similar circumstances that "[f]ar from helping Defendants, those cases suggest that the drafters of the applicable tax regulations wanted the term "dealer" to apply only to people selling to customers.").

### 2. SEC Guidance and No-Action Letters

Second, Defendants and Amici argue Plaintiff's attempt to characterize Defendants as "dealers," and thus to bring Defendants within the scope of the SEC's enforcement powers pursuant to Exchange Act Section 15(a)(1), 15 U.S.C. § 78o(a)(1), contravenes the Commission's own public guidance.  Def. Mem at 24-29; Amici Mem. at 27-28.  In so saying, these parties cite primarily to the SEC's Guide to Broker-Dealer Registration (the "Guide").[9]

The Guide is meant to provide information to investors, including those considering whether to register as a broker or a dealer.  *See generally* Guide.  It does so by listing several factors the SEC considers to be indicative of whether a person meets the statutory definition of a "dealer."  These factors include whether a person: (1) holds himself or herself out as being willing to buy and sell a particular security on a continuous basis; (2) runs a matched book of repurchase agreements; (3) issues or originates securities that he also buys and sells; (4) advertises or otherwise lets others know he or she is in the business of buying and selling securities; (5) does business with the public (either retail or institutional); (6) makes a market in, or quotes prices for both purchases and sales of, one or more securities; (7) participates in a "selling group" or otherwise underwrites securities; (8) provides services to investors, such as handling money and securities, extending credit, or giving investment advice; and/or (9) writes derivatives contracts that are securities.  *Id.*; *see also* Def. Mem. at 25 ("The criteria the SEC considers when determining if an individual or entity must register as a broker boils down to two considerations: (1) does the person advertise to the public that he or she is willing to buy and sell particular securities, carry a dealer inventory of securities to be able to accomplish that goal, and quote prices for both purchases and sales[]; and (2) does the person offer services to the investing public, such

---

[9] SEC, *Guide to Broker-Dealer Registration* (rev. Dec. 12, 2016), https://www.sec.gov/about/reports-publications/investor-publications/guide-broker-dealer-registration (last visited Nov. 3, 2023).

as underwriting, lending, or originating securities, extending credit to investors, or giving investment advice.").

Defendants argue LG Capital does not hold itself out to the public as a dealer; LG capital never performed dealer services for others; and the SEC admitted Defendants acted as traders and not dealers.  Def. Mem. at 25-29 (detailing these arguments); *see also* Amici Mem. at 27.  Thus Defendants claim, based on the SEC's own guidance, they cannot be properly characterized as "dealers."  Def. Mem. at 25.

The Court agrees with Defendants and Amici that the factors set forth in the Guide are useful in discerning what constitutes a "dealer" within the meaning of the Exchange Act.  *See* Def. Mem. at 26 (collecting cases in which courts relied, in part, on the SEC's Guide).  However, the Court disagrees it is required to engage in a holistic analysis of the Guide's factors, especially at the pleading stage.  *See SEC v. Keener*, 2020 WL 4736205, at *4 (S.D. Fla. Aug. 14, 2020) (Bloom, J.) (concluding the same); *SEC v. River N. Equity, LLC*, 415 F. Supp. 3d 853, 858-59 (N.D. Ill. 2019) (Durkin, J.) (same); *SEC v. Fierro*, 20-CV-2104, 2020 WL 7481773, at *3 (D.N.J. Dec. 18, 2020) (Shipp, J.) (same) ("[T]he Court finds *River North* and *Keener* persuasive, and denies Defendants' Motion [to Dismiss pursuant to Rule 12(b)(6)] predominantly for the reasons set forth in those cases…not only does the Complaint sufficiently explain how Defendants operated the business in which they bought and sold securities for their own account, but it also alleges some of the dealer factors that Defendants mistakenly suggest must be established at the pleading stage."); *Carebourn Capital*, 2022 WL 1639515, at *5 ("Defendants' position also reflects a misplaced reliance on a multi-factored inquiry discussed in the SEC's Guide … Like other courts faced with this argument, however, this Court concludes that the Guide invites a fact-intensive analysis that is ill-suited for application to a [Rule 12(b)(6) motion to dismiss]."); *see also SEC v.*

*GPL Ventures LLC*, 2022 WL 158885 (S.D.N.Y. Jan. 18, 2022) (Hellerstein, J.) (denying the

defendants' Rule 12(b)(6) motion to dismiss and rejecting the argument the SEC inadequately pled

defendants met the Exchange Act's "dealer" definition" for the purposes of alleging failure to

register pursuant to section 15(a) of the Act); Pl. Mem. at 18, n.10 (noting, at the time of writing,

*GPL Ventures LLC* was the only case within the Second Circuit to have addressed the issue and

stating "[t]he *GPL* court appears to have conflated the standard for brokers (defined under

Exchange Act 3(a)(4)) with the standard for dealers (defined in Exchange Act 3(a)(5)), but did

also analyze the regularity of defendants' participation in the at-issue transactions in deciding

whether the complaint alleged dealer activity." (referencing *GPL Ventures LLC*, 2022 WL 158885,

at *6)).[10]

### 3.  Reading "Customer" into the Act's "Dealer" Definition

While both Defendants and Amici argue there is a "customer" component to the Act's

"dealer" definition, Amici focus more extensively on this particular argument.  *See generally*

Amici Mem.  Specifically, Amici ask the Court to find the Act's "dealer" definition extends only

to those who execute *customer orders* as "part of a regular business" rather than more broadly

extending the definition to all those who "engaged in the business" of "buying and selling

securities."  *Id.* at 16.  In support of their interpretation, Amici argue the statutory text, the SEC's

own guidance, and "well-established understandings" reflect their reading of the phrase.  *Id.* at 16-

19 (referencing sources from the time the Exchange Act was adopted, including SEC Rules and

---

[10] On November 9, 2023, Plaintiff filed a notice of supplemental authority, directing the Court's attention to a recent decision from the Southern District of New York in *Morningview Financial LLC*, 22-CV-8142 (S.D.N.Y. Nov. 7, 2023) (Marrero, J.).  *See* ECF No. 55.  In which, the court rejects arguments from the defendants, a convertible note business and its principals, that the SEC's complaint did not adequately plead they were dealers within the meaning of the Exchange Act.  *See id.*  Relevant here, the *Morningview Financial* court similarly rejected the defendants argument that the SEC's historical guidance is controlling, or warrants significant weight, in deciding whether defendant's are dealers within the meaning of the Act.  *See id.* at 26-30 (relevant portions of the *Morningview Financial*, 22-CV-8142 decision).

reports, treatises, case law, congressional amendments, and the statute's own distinction between "brokers" and "dealers" to argue the historical context surrounding the Act supports reading a requisite customer component into the Act's "dealer" definition). Amici also argue the fact the Exchange Act exempts from registration those "not engaged as part of a regular business" of buying and selling securities also "makes clear that traders and investors (who do not have customers) cannot be characterized as dealers." *Id.* at 20 (referencing 15 U.S.C. § 78c(a)(5)(B)); *see also id.* at 20-21 (referencing tax-related court rulings from the time Congress enacted the Exchange Act, which interpret the phrase "not in the course of established business," to be in-line with Amici's interpretation of "not as part of the regular business"—namely, to require a customer component—in order to argue historical context supports Amici's "dealer" interpretation).

Plaintiff counters this assertion and argues at the outset the statute's plain meaning omits (1) any exception for traders, or registered investment advisors and funds, who would otherwise meet the Act's "dealer" definition, and (2) any requirement that "dealers" must effectuate *customer* orders in order to be characterized as such. Pl. Mem. at 14, 19; *see also id.* at 22 (responding to Amici's argument regarding the reconciliation of the Act's "dealer" and "broker" definitions). In the alternative, Plaintiff also argues if dealers are required to have customers, then the issuers whose securities Defendants purchased and distributed were its customers. *Id.* at 29-30.

The Court finds, at this stage of the litigation, the plain meaning of the statute supports Plaintiff's assertion Defendants are dealers, irrespective of whether they were effectuating customer orders. *See id.* at 19 (referencing *Food Mktg. Inst. V. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) ("In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself. Where, as here, that examination yields a clear answer, judges must stop.")). The Act defines a dealer as "any person

engaged in the business of buying and selling securities for such person's own account through a broker or otherwise" but excludes "person[s] [who] buy[] or sell[] securities for such person's own account, either individually or in a fiduciary capacity, but not as part of regular business." 15 U.S.C. §§ 78c(a)(5)(A) and (B). The Act does not write in the requirement dealers must "effectuate customer orders." *See id.* Indeed, the Act's "dealer" definition omits a written nexus between "customers" and "dealers" altogether. *Id.* Whether Congress intended for there to be a connection between customers and dealers such that the latter depends on the existence of the former is a question more suitable once the factual record is developed. *See Fife*, 2021 WL 5998525, at *8 ("[I]t would be premature at the pleadings stage to determine whether [the SEC's cause for relief] [is] prohibited as a matter of law, and ... instead any determination on the availability of specific forms of relief should be undertaken after the case has been factually and legally developed."). Accordingly, the Court declines to embrace Amici's reading at this time. *See also* ECF No. 55, Exhibit A at 41 (the SEC's Notice of Supplemental Authority dated November 9, 2023, including the Southern District of New York's recent ruling in *Morningview Financial LLC*, 22-CV-8142, in which the court held "to sufficiently allege that a person or entity acted as a prima facie "dealer" under the Act, a litigant must plead facts establishing that the person or entity (1) bought and sold securities, (2) as principal rather than as agent for another, (3) as part of a profit-seeking enterprise, and (4) on more than a few isolated occasions." *Morningview Financial LLC*, 22-CV-8142, at 38).

### 4.  <u>Conclusion</u>

Based on the analysis above, the Court finds Plaintiff has plausibly alleged Defendants were engaged in the regular business of buying and selling securities while not registered with the SEC as dealers, and while control person Defendant Lerman was not associated with a separate

registered dealer, in contravention of the Act's registration requirements. Exchange Act § 15(a)(1), 15 U.S.C. § 78o(a)(1).

Moreover, based on the parties' submissions, the Court finds it appropriate to caution its opinion here is not meant to—and does not—extend to all private funds and investment advisors the SEC may seek to bring within its enforcement powers. The Court merely finds Plaintiff has plausibly asserted these Defendants meet the statue's "dealer" definition based on the particular facts alleged in the Complaint. In other words, the Court finds it is reasonably plausible Defendants are dealers, but it does not speak to the probability that they are. Still, this is sufficient grounds upon which the Court may rest its instant decision. Thus the Court DENIES Defendants' Motion to Dismiss at ECF No. 26.

SO ORDERED.

**s/WFK**

_____
HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: November 13, 2023
      Brooklyn, New York